**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

_____

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) No. 3:19-cr-073-VLB |
| v. | ) |
| | ) |
| ANTON JEPSEN | ) March 26, 2020 |

_____

**MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION FOR COMPASSIONATE RELEASE PURSUANT TO 18 U.S.C. § 3582(c)**

Anton Jepsen, by counsel, hereby submits this memorandum of law in

support of his motion for compassionate release. *The Government does not*

*object to the motion*.

**PROCEDURAL HISTORY**

1.      This case arrived on the Court's docket in March, 2019, via

transfer from the District Court for the Southern District of New York. See ECF

Doc. No. 1, filed Mar. 13, 2019. On June 1, 2017, Mr. Jepsen had released from

BOP custody and commenced supervised release.

2.      During the course of his supervision in Connecticut, Mr. Jepsen

maintained contact with his supervising probation officer. He filed monthly

reports, and he did not change addresses without contacting his supervising

officer.

3.      Testing and treatment records during that period indicate that Mr.

Jepsen had been using controlled substances, particularly methamphetamine,

from time to time. Mr. Jepsen spent time at the APT foundation and in

outpatient treatment. His use of meth is not disputed.

4.      On July 10, 2019, the supervising probation officer prepared a Petition for Warrant or Summons for Offender Under Supervision, asserting that Mr. Jepsen violated the conditions of supervision due to his testing positive for methamphetamine.  ECF Doc. No. 13, at 1.  The officer "requested that a summons be issued," but on July 15, 2019, the Court ordered the issuance of a warrant.  *Id.*

5.      On August 28, 2019, law enforcement executed the warrant.  Mr. Jepsen was at his home, where he resided with his sister and two of their great-nieces, both of whom are adults.  When law enforcement executed the warrant, one of the nieces reportedly was stopped while driving nearby the home.  Mr. Jepsen was arrested without incident, and Mr. Jepsen stipulated to detention at court.

6.      Mr. Jepsen has been in custody at Wyatt Detention Facility ever since, approximately 7 months in total.

7.      The Court commenced the violation hearing on November 18, 2019, and largely covered all of the key issues.  For example, Mr. Jepsen admitted to the violation, the Court found Mr. Jepsen in violation of the terms of his supervised release, and the Court indicated the intent to impose a 6-month prison term, after determining the advisory Guideline range to be 3-9 months.  See also Violation Report, ECF Doc. No. 6, at 3.

8.      During the hearing, Mr. Jepsen interacted directly with the Court in response to the Court's inquiries, and he was present when the Court indicated the intention to impose a 6-month prison term for his violation of the

conditions of supervised release.  The Court did not have the opportunity to fully present the Court's views on conditions of supervised release post-incarceration, as Mr. Jepsen started to react to the Court's imposition of sentence.  The hearing ended, somewhat abruptly, as counsel asked for a continuance to review and provide medical records concerning Mr. Jepsen's well-being and deterioration in his condition since his arrest.

9.      On February 11, 2020, the Court held the remainder of the hearing.  The Court raised two primary concerns regarding events since indicating at the prior hearing that the Court would impose a 6-month prison term and began to address a further term of supervised release.  First, the Court noted Mr. Jepsen's conduct at the close of the prior hearing.  Second, the Court raised concern regarding information from Wyatt that Mr. Jepsen had made a false report.  The Court concluded the hearing by imposing a prison term of 9 months, with no supervised release term to follow.

10.     On February 25, 2020, Mr. Jepsen, via counsel, filed a notice of appeal.  Mr. Jepsen will be withdrawing the appeal as soon as counsel is able to do so.

<u>EVENTS SINCE FEBRUARY HEARING</u>

On March 6 and 7, 2020, a total of two Connecticut hospital employees were reported as having tested positive, but the two were not Connecticut residents.  See *THE LATEST: More than 800 COVID-19 cases, 19 deaths*, WFSB, Mar. 25, 2020, as of 4:20 PM.[1]  Courts, businesses, and schools all continued to operate as usual, with some schools canceling upcoming trips abroad, just to be safe.  On March 8, 2020, Connecticut reported its first positive test result for the coronavirus.

Just 17 days later, more than 800 people in Connecticut have tested positive, and 19 have died.  Courts are open, sort of, and everyone is being told to stay home unless they have "essential" jobs.  Counsel sits in his basement, typing on a portable computer.  God bless the wifi.

The prisons have not escaped the coronavirus.  Rather, jails are expected to be one of the hardest hit locations.  See Amanda Klonsky, *An Epicenter of the Pandemic Will Be Jails and Prisons, If Inaction Continues*, N.Y. TIMES, Mar. 16, 2020 (copies of all cited articles are filed with this memo); Danielle Ivory, *'We Are Not a Hospital': A Prison Braces for the Coronavirus*, N.Y. TIMES, Mar. 17, 2020.  First reports of positive tests in prison are starting to surface.  See Joseph Konig & Ben Feuerherd, *First Rikers Island Inmate tests positive for coronavirus*, N.Y. POST, Mar. 18, 2020; David Shortell & Kara Scannell, *New coronavirus cases in US jails heighten concerns about an unprepared system*, CNN, dated Mar. 20, 2020 ("Between Tuesday and Wednesday, a staffer at a medium security federal prison in Berlin, New Hampshire, and an employee at a Bureau of Prisons administrative facility in

---

[1] **Available at https://www.wfsb.com/news/the-latest-more-than-covid--cases-deaths/article_54edec52-67ad-11ea-8482-877cb5d00dcd.html.**

Grand Prairie, Texas, were presumed to have the illness, said Sue Allison, an agency spokeswoman.").[2]  MDC Brooklyn, which commonly is used to transition people to their longer time facility and also where Mr. Jepsen served his prior sentence, also has a positive test.  See Kevin Johnson, *First federal inmate tests positive for coronavirus quarantined in Brooklyn detention center*, USA TODAY, dated Mar. 22, 2020 ("Federal officials said the inmate, who was not identified, complained of chest pains March 16, shortly after arriving at the New York facility. He was taken to an outside hospital three days later where he was tested for the virus.")[3]; *Department of Correction Employee Tests Positive for COVID-19*, NBC News, Mar. 23, 2020 (reporting first positive test of state DOC employee, who works at Garner Correctional).[4]

The courts are recognizing the problems with keeping inmates in the prison environment, particularly those at higher risk of dying from coronavirus.  One court recently permitted release of a defendant from Wyatt awaiting sentencing, even though a prior motion for release had been denied.

>All levels of government nationwide have recently taken drastic measures in light of the COVID-19 pandemic to promote "social distancing" and to prohibit the congregation of large numbers of people with one another. But, as is true for most jails and prisons, the conditions of confinement at Wyatt are not compatible with these safeguards.

---

[2] Available at https://www.cnn.com/2020/03/18/politics/coronavirus-in-us-jails-heighten-concerns/index.html.

[3] Available at https://www.usatoday.com/story/news/politics/2020/03/22/first-federal-inmate-tests-positive-coronavirus-new-york/2893959001/.

[4] Available at https://www.nbcconnecticut.com/news/local/department-of-correction-employee-tests-positive-for-covid-19/2243815/.

See Order, *United States v. Fellela*, No. 3:19-cr-079-JAM, ECF Doc. No. 80, filed
Mar. 20, 2020, at 2.  *See also* Order, *United States v. Hawkins*, No. 3:19-cr-229-
AWT, ECF Docket Entry No. 23 , filed Mar. 19, 2020 (ordering release for pre-
trial defendant from Wyatt who allegedly committed offense while on
supervised release"[d]ue to his special health condition"; release had been
denied on February 24th).

      Mr. Jepsen presents with three at least three conditions that make him
at greater risk from the coronavirus.[5]  For people who are HIV+, there is the
potential for greater harm, although that is being studied.

> During a special session of the Conference on Retroviruses
> and Opportunistic Infections on March 10—held virtually
> by webcast because of the crisis—John Brooks, MD, of the
> Centers for Disease Control and Prevention said that the
> risk of COVID-19 is likely greater for HIV-positive people
> who have a low CD4 count or do not have full viral
> suppression on antiretrovirals. Nonetheless, given how
> much remains unknown, he advised that all people
> with HIV take precautions.

Liz Highleyman, *Treatment News, UPDATED: What People With HIV Need to
Know About the New Coronavirus*, POZ, Mar. 13, 2020.[6]

      Mr. Jepsen also is diabetic, which clearly puts him at greater risk if he
contracts COVID-19.  See Erin Black, Why coronavirus is more dangerous for

---

[5] Medical records from Wyatt Detention Facility previously were provided to
the Government before the February hearing.  The records confirm his medical
conditions, including evidence of testing of Mr. Jepsen's glucose levels over
time and his receiving several prescription medications, some of which
concern the conditions discussed herein.  Counsel is ready to provide those
records to the Court if deemed necessary for the Court to grant this motion.
[6] Available at **https://www.poz.com/article/people-hiv-need-know-new-coronavirus**.

diabetics, CNBC, published Mar. 25, 2020.[7]  Finally, his hypertension presents

additional concerns.  See Interim Clinical Guidance for Management of

Patients with Confirmed Coronavirus Disease (COVID-19), CDC, updated Mar.

7, 2020 ("Patients who reported no underlying medical conditions had an

overall case fatality of 0.9%, but case fatality was higher for patients with

comorbidities: 10.5% for those with cardiovascular disease, 7% for diabetes,

and 6% each for chronic respiratory disease, hypertension, and cancer.").[8]

## LEGAL DISCUSSION

I.    **The First Step Act amended the compassionate release statute and gave the courts greater discretion to amend sentences.**

The compassionate release statute was first enacted as part of the

Comprehensive Crime Control Act of 1984. It provided that a district court

could not modify a final term of imprisonment except in four situations, one

of which was the existence of "extraordinary and compelling  reasons"

warranting  the  reduction,  as  determined  by  the  sentencing  court.  But

although the courts had the final decision-making authority over whether a

sentence would be reduced, the statute imposed a gatekeeper—that

authority could be invoked only upon a motion by the Director of the BOP.

Without such a motion, sentencing courts were powerless to reduce a

prisoner's sentence, even if the court otherwise would have concluded that

extraordinary and compelling reasons warranted the reduction. 18 U.S.C. §

---

[7] **Available at https://www.cnbc.com/2020/03/25/why-coronavirus-is-more-dangerous-for-diabetics.html.**
[8] **Available at https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html.**

3582(c)(1)(A)(i); *see also* PL 98–473 (HJRes 648), PL 98–473, 98 Stat 1837 (Oct. 12, 1984).

That changed when Congress enacted the First Step Act, which amended § 3582(c)(1)(A). See P.L. 115-391, 132 Stat. 5194, at § 603 (Dec. 21, 2018). Under the amended statute, a court can now reduce a sentence for "extraordinary and compelling reasons" in two circumstances: (i) if the Director of the BOP files a motion requesting such relief; or (ii) "upon motion of the defendant," if the defendant has fully exhausted all administrative remedies to appeal the BOP's failure to bring a motion, or if 30 days has lapsed "from the receipt of such a request by the warden of the defendant's facility," whichever is earlier. 18 U.S.C. § 3582(c)(1)(A). *See also United States v. Cantu*, No. 1:05-CR-458-1, 2019 WL 2498923, at *3 (S.D. Tex. June 17, 2019) ("[u]nder the newly amended § 3582(c)(1)(A) [the defendant] has standing to bring this motion because more than 30 days elapsed between his reduction-in-sentence request to the warden and a response."); *United States v. Cantu-Rivera*, No. CR H-89-204, 2019 WL 2578272, at *1 (S.D. Tex. June 24, 2019) (defendant's "petition . . . meets the requirement of a lapse of 30 days from the receipt by the warden of the defendant's facility . . . The Court therefore has the authority to address the motion of the defendant.").

II.     **The Court has the discretion to review this motion.**

Prior to the FSA, application of Section 3582(c) occurred within the context of a person in physical custody of the BOP, but the FSA setting a 30-day waiting period for a response and then shifting to the courts indicates that the BOP remedy is an administrative one.  As such, prisoner litigation commonly would require that a prisoner exhaust that remedy before seeking relief from the courts.  That requirement has been satisfied.  Alternatively, that requirement should not apply in this situation

Of import to this issue, Mr. Jepsen is not at a BOP facility.  That is not particularly the fault of anyone, but his continued presence at Wyatt should not serve to preclude him from relief.  His circumstance – including that he has not been moved from Wyatt – is a product of an unforeseen pandemic and efforts to reduce the risk of the spread of coronavirus.  See *Updates to BOP COVID-19 Action Plan Inmate Movement*, BOP Mar. 19, 2020 ("As we previously described generally, inmate internal movement is suspended with limited exceptions.").[9]

The availability of an administrative remedy is a core principle in determining whether a court can bypass what would otherwise be an administrative process prerequisite.  In the context of the Prisoner Litigation Reform Act, the Supreme Court provided the following guidance.

> [W]e note as relevant here three kinds of circumstances
> in which an administrative remedy, although officially
> on the books, is not capable of use to obtain relief. . . .

---

[9] **Available at https://www.bop.gov/resources/news/20200319_covid19_update.jsp.**

> Given prisons' own incentives to maintain functioning remedial processes, we expect that these circumstances will not often arise. . . . But when one (or more) does, an inmate's duty to exhaust "available" remedies does not come into play.
>
> First, . . . an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates. . . . "[S]ome redress for a wrong is presupposed by the statute's requirement" of an "available" remedy; "where the relevant administrative procedure lacks authority to provide any relief," the inmate has "nothing to exhaust." *Id.,* at 736, and n. 4, 121 S.Ct. 1819. . . . When the facts on the ground demonstrate that no such potential exists, the inmate has no obligation to exhaust the remedy.
>
> Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use. In this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it. As the Solicitor General put the point: When rules are "so confusing that ... no reasonable prisoner can use them," then "they're no longer available." . . .
>
> And finally, the same is true when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation.

*Ross v. Blake*, 136 S. Ct. 1850, 1859–60 (2016).  With Mr. Jepsen not currently housed in a BOP facility, there is no availability of a warden to whom he can direct a petition for relief.  Mr. Jepsen has made a request of the warden at Wyatt, both by his own effort and via counsel, but the warden has indicated that he does not have the authority to act.  In this situation, "the facts on the ground demonstrate that no such potential exists."  *Id.*  Alternatively, that denial of authority by the warden is indeed a denial of his request and gives the Court the discretion to review this motion.

Moreover, to wait 30 days for a response is to ignore the fast-moving nature of the COVID-19 pandemic. Thirty days ago, on February 24, 2020, there were 15 COVID-19 cases in the United States.  As of 4:00 p.m. on March 25, 2020, there were 54,453, according to the CDC case updates.[10]  If cases continue to grow at the same rate, without considering any increase in speed, millions of Americans will be infected by April 25.  Mr. Jepsen cannot wait that long.

III.    **Extraordinary and compelling circumstances exist here for amending the sentence.**

    A.    **The relief requested here is consistent with the text of the statute and the Sentencing Commission's policy statement.**

Congress did not define what would constitute an "extraordinary and compelling reason" warranting a reduction of a sentence under § 3582(c). Indeed, the legislative history confirms that it intended to grant federal sentencing courts broad discretion to make those determinations on a case-by-case basis, and to reduce sentences where sufficient reasons exist.

Congress's initial goal in passing the Comprehensive Crime Control Act was to abolish federal parole and create a "completely restructured guidelines sentencing system." S. Rep. No. 98-225, at 52, 53 n.74 (1983).  But with the elimination of parole as a corrective measure in cases where early

---

[10] Available at https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html#investigation.  As of the moment of revising this memo, March 26, 2020, at 11:50 AM, Johns Hopkins University is reporting 69,246 positive cases in the United States.  See *Coronavirus COVID-19 Global Cases by the Center for Systems Science and Engineering*, Coronavirus Resource Center, Johns Hopkins University & Medicine, available at https://coronavirus.jhu.edu/map.html.

release is warranted, Congress recognized the need for an alternative review process. It therefore allowed for judicial reduction of certain sentences under § 3582(c):

> The Committee believes that there may be unusual cases in which an eventual reduction in the length of a term of imprisonment is justified *by changed circumstances*. These would include cases of severe illness, cases in which *other extraordinary and compelling circumstances* justify a reduction of an unusually long sentence, and some cases in which the sentencing guidelines for the offense of which the defendant was convicted have been later amended to provide a shorter term of imprisonment.

*Id*. at 55–56 (emphasis added). Put differently, rather than having the Parole Commission review every federal sentence, Congress decided to let sentencing courts decide, in a far narrower band of cases presenting extraordinary and compelling circumstances, if "there is a justification for reducing a term of imprisonment." *Id*. at 56.

Unfortunately, the establishment of the BOP as a gatekeeper effectively eliminated the safety valve. The BOP hardly ever opened the gate and is unable to do so here as contemplated by the statute because Mr. Jepsen – although sentenced – is not in a BOP facility.[11]  As a result, due to the amendments made by the First Step Act, the Court should act due to the

---

[11] *See, e.g.*, The Answer is No: Too Little Compassionate Release in US Federal Prisons, Human Rights Watch, 2 (Nov. 2012), https://www.hrw.org/sites/default/files/reports/ us1112ForUploadSm.pdf (noting that between 1992 and 2012, the average annual number of prisoners who received compassionate release following a motion by the BOP was less than two dozen).

extraordinary and compelling reasons presented by the confluence of the pandemic and Mr. Jepsen's significant health risks.

The Sentencing Guidelines do not undermine this conclusion.  In enacting § 3582(c), Congress delegated some responsibility for expounding upon what constitutes "extraordinary and compelling reasons" to the U.S. Sentencing Commission (the "Commission"). *See* 28 U.S.C. § 994(t) ("The Commission . . . shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples."); *see also* 28 U.S.C. § 992(a)(2) (the Commission shall promulgate general policy statements regarding "the sentence modification provisions set forth in section[ ] . . . 3582(c) of title 18"). The resulting policy statement by the Commission sets forth the following factual considerations of note here: (i) the  medical condition of the defendant (including terminal illness and other serious conditions and impairments); (ii) the age of the defendant (for those 65 and older with serious deterioration related to aging who have completed at least 10 years or 75 percent of the term of imprisonment); . . . ; and (iv) "other reasons" as determined by the BOP. U.S.S.G. § 1B1.13, Application Note 1(A). The fourth category specifically includes "an extraordinary and compelling reason other than, or in combination with," the first three.  *Id.*[12]

As the above language makes clear, extraordinary and compelling reasons for a sentence reduction may exist even when an inmate is not

---

[12] Mr. Jepsen is not 65 years old or older, but when he hits the 7-month mark on March 27, 2020, he will have served 78 percent of his 9-month sentence.

elderly, ill, or facing complicated family circumstances. And though the policy statement—which has not been amended since the passage of the First Step Act—vests the Director of the BOP with the authority to determine when such "other reasons" might warrant a reduction in a particular case, that language is now irreconcilable with the revised statute, which permits a defendant to bring a § 3582 motion to the Court without any response from the BOP or even if the BOP expressly decides that no reasons warrant a reduction of sentence. Accordingly, that aspect of the commentary clearly is advisory but not binding on the courts for two reasons: (1) as a general matter, the Guidelines are advisory only, *see United States v. Booker*, 543 U.S. 220 (2005); and (2) it is inconsistent with the text and the undisputed purpose of the First Step Act. *See United States v. Da Cai Chen*, 127 F.3d 286, 291 (2d Cir. 1997) (commentary that relates to a statute, or to a guideline that mirrors a statute (as here), is not entitled to deference); *see also United States v. Pierninanzi*, 23 F.3d 670, 683 (2d Cir. 1994).[13]

The Court's authority to reduce Mr. Jepsen's sentence is not only consistent with the statute, but also with the language in the policy statement,

---

[13] Indeed, at least three district courts, since the passage of the First Step Act, have observed that §1B1.13 "has not yet been updated to reflect that defendants (and not just the BOP) may move for compassionate release," *United States v. McGraw*, No. 2:02-cr-00018 (LJM)(CMM), 2019 WL 2059488, at *2 (S.D. Ind. May 9, 2019), and "[b]ecause the current version of the Guideline policy statement conflicts with the First Step Act, the newly-enacted statutory provisions must be given effect." *Cantu-Rivera*, 2019 WL 2578272 at *2 n.1. *See also Cantu*, 2019 WL 2498923 at *4 ("Given the changes to the statute, the policy-statement provision that was previously applicable to 18 U.S.C. § 3582(c)(1)(A) no longer fits with the statute and thus does not comply with the congressional mandate that the policy statement must provide guidance on the appropriate use of the sentence-modification provisions under § 3852.").

which makes clear that "[t]he court is in a unique position to determine whether the circumstances warrant a reduction (and, if so, the amount of reduction)" and encouraging the filing of a motion for compassionate release where a defendant "meets any of the circumstances set forth in [the] Application Note."  As mentioned above, in amending the language of 18 U.S.C. § 3582(c)(1)(A), Congress finally empowered *courts* to make this critical determination, even where the BOP would disagree that a defendant is entitled to relief.

Thus, a district court in Texas held as follows:

> [T]he correct interpretation of § 3582(c)(1)(A)—based on the text, statutory history and structure, and consideration of Congress's ability to override any of the Commission's policy statements 'at any time' [. . .]—is that when a defendant brings a motion for sentence reduction under the amended provision, the Court can determine whether any extraordinary and compelling reasons other than those delineated in U.S.S.G § 1B1.13 cmt. N.1(A)-(C) warrant granting relief.

*Cantu*, 2019 WL 2498923 at *5.  Likewise, this Court may make an independent assessment of Mr. Jepsen's case in considering whether extraordinary and compelling reasons warrant the reduction of his sentence.[14]

---

[14] *See also Cantu*, 2019 WL 2498923, at *4 ("Given the changes to the statute, the policy-statement provision that was previously applicable to 18 U.S.C. § 3582(c)(1)(A) no longer fits with the statute and thus does not comply with the congressional mandate that the policy statement must provide guidance on the *appropriate use* of sentence-modification provisions under § 3582."); *Cantu-Rivera*, 2019 WL 2578272, at *2 n.1 (finding authority to determine that defendant was entitled to relief under the catch-all provision in the commentary to § 1B1.13 because the "current policy statement predates the enactment of the First Step Act and is not likely to be amended within the foreseeable future due to lack of a sufficient number of serving members of

B.    The circumstances warrant the requested reduction.

The deadly cocktail of Mr. Jepsen's health and the coronavirus risks in prison present circumstances that warrant his release, especially in considering that he only has two months remaining on his sentence.  Mr. Jepsen is HIV+ and diabetic, and he has hypertension.  Also 55 years old, Mr. Jepsen is at greater risk of severe consequences if he contracts the coronavirus and COVID-19.   Mr. Jepsen was sentenced to a nine-month term for violating conditions of his supervised release.  Those violations arise from his use of controlled substances.  There are no issues of violence.  Arrested and detained on August 28, 2019, Mr. Jepsen currently is projected to release on May 27, 2020.  See note 12, *supra.*

The risk to Mr. Jepsen from the coronavirus and the existence of a pandemic were not contemplated when he was sentenced to 9 months imprisonment by the Court on February 11, 2020.  As discussed *supra*, the world clearly has changed radically since then, and the risk to Mr. Jepsen if he contracts the virus is significant and changes the analysis of whether a 9-month term in prison is warranted, especially when considering the remaining 2-month balance of that term.  With BOP and state corrections facilities increasingly reporting positive tests, and with the pandemic continuing to spread in the community, it seemingly is a matter of time before the

---

the Sentencing Commission."); ***United States v. Beck***, No. 1:13-CR-186-6, 2019 WL 2716505, at *6 (M.D.N.C. June 28, 2019) ("While the old policy statement provides helpful guidance, it does not constrain the Court's independent assessment of whether 'extraordinary and compelling reasons' warrant a sentence reduction under § 3582(c)(1)(A)(i).").

coronavirus makes its way into Wyatt, assuming that it is not already there with someone who is asymptomatic. This concern recently has led to a number of releases of defendants awaiting sentencing or trial who have greater health risk, so the courts in the District of Connecticut clearly are taking note of the circumstances.

A motion for relief under 18 U.S.C. § 3582(c)(1)(A)(i) requires a court to consider other factors that may warrant relief. *See Cantu-Rivera*, 2019 WL 2578272, at *2 (the court considered rehabilitation and the "unwarranted [sentencing] disparities among defendants" in determining resentencing was appropriate). In determining whether Mr. Jepsen's sentence should be reduced, the Court must decide, *inter ali*a, whether he presents a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g). See U.S.S.G. § 1B1.13(2). If he does not, the Court looks to the factors outlined in 18 U.S.C. § 3553(a). As explained below, these factors weigh in favor of relief here.

      1.    Mr. Jepsen is not a danger to the community that warrants an additional two months in prison that would risk his health.

If Mr. Jepsen was released, he should not pose a danger to the community. He has a friend who attended both court hearings and remains concerned and willing to take Mr. Jepsen into his home. That man communicates with counsel regularly regarding Mr. Jepsen's distress at Wyatt and has repeatedly re-affirmed his willingness to have Mr. Jepsen reside with him. If Mr. Jepsen's residence is a point of concern, the U.S. Probation Office

can confirm with his friend.  Mr. Jepsen also is contact with his sister again, who is providing some support, at least emotionally.

Mr. Jepsen does not have a history of violence.  His violations of supervised release did not entail violent conduct and neither did his original offense.  To the contrary, Mr. Jepsen prides himself on being a friend to animals and those in need.

Mr. Jepsen's only risk is his meth addiction.  He has now been clean for several months, and he knows where to go if he is seeking help.  That addiction is not being addressed at Wyatt, other than forced abstinence.

Also, these circumstances present a unique moment in time in that if he is released now, he should be reasonably expected to shelter in place for at least 14 days, if not significantly longer.  In conversation with counsel, Mr. Jepsen continuously raises concerns regarding his risks from the coronavirus and the need to maintain social distancing.  The concept of maintaining 6 feet distance from others simply is not practical in a prison setting.  Detainees share small cells.  They release into common areas.  They go in groups during movement times to get medications and haircuts or report to jobs or attend church.  If released, Mr. Jepsen's goal is to be as far from people as possible, at least until the spread of the virus is stemmed.

In short, Mr. Jepsen is not a danger to the community that warrants an additional two months in prison.

2.      The Relevant § 3553(a) Factors Weigh in Favor of Relief.

This Court must next weigh the factors set forth in 18 U.S.C. § 3553(a) to determine whether Mr. Jepsen's request for a sentence reduction should be granted. Meth use is a serious risk to anyone, Mr. Jepsen included, and its use potentially increases other risks associated with illicit drug use. That said, Mr. Jepsen already has served nearly 7 months at Wyatt. He has been punished, deterred, and incapacitated.

Counsel's recollection is that at the November hearing, the Court raised the specific concern of promoting respect for the law. Part of promoting respect for the law is the ability of the law and the courts to recognize that circumstances change, even in relatively short periods of time. The change of circumstances has been recognized in recent decisions to release defendants who previously had been denied release. The ability to recognize a salient change of circumstances ensures respect for the law, as manifested in the Compassionate Release statute. Indeed, promoting respect for the law arguably is why the courts were given more discretion by the amendment to the Compassionate Release statute.

The need to "provide the defendant with needed educational or vocational training, medical care, or other correctional treatment" further favors ordering Mr. Jepsen's release. Wyatt is essentially a holding place at this point. If Mr. Jepsen were to be moved from there to MDC, which is reported to have a positive coronavirus test, his ability to participate in programming would be extremely limited due to the short window of time

remaining on his sentence, and that assumes that any programming of substance even is occurring there.  His need for medical care is significant, regardless of the coronavirus, so the risks presented here outweigh the need for more time in prison in these circumstances.

With regards to the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, 18 U.S.C. § 3553(a)(6), and to consider the advisory Guidelines range, releasing Mr. Jepsen would not be inconsistent with this factor.  His Guidelines range was 3-9 months, and his time served to date squarely is within that range.

WHEREFORE, the Defendant requests that the Court grant this motion and amend the judgment to a prison term of time served.

Respectfully submitted,
ANTON JEPSEN

/s/Charles F. Willson/s/_____
By Charles F. Willson (# ct24129)
FEDERAL DEFENDER'S OFFICE
10 Columbus Boulevard, 6th Floor
Hartford, CT 06106
Tel:    (860) 493-6260
Fax:   (860) 493-6269
email: Charles_Willson@fd.org

## CERTIFICATION OF SERVICE

This is to certify that on March 26, 2020, a copy of the foregoing was filed electronically via the Court's CM/ECF system, and by that system, counsel for the Government has been provided with a copy of the foregoing.

/s/Charles F. Willson/s/_____
Charles F. Willson